# SMITH LAW FIRM
## ATTORNEYS AT LAW

J. ARTHUR SMITH, III  
jasmith@jarthursmith.com

SIMONE R. NUGENT  
snugent@jarthursmith.com

J. ARTHUR SMITH, IV  
asmithiv@jarthursmith.com

December 11, 2023

*Via E-mail: jones@lsu.edu*

**Carlton (Trey) Jones**  
Deputy General Counsel  
Louisiana State University  
3810 West Lakeshore Drive, Suite 124  
Baton Rouge, Louisiana 70808  
office 225-578-6332 | mobile 225-252-1588  
jones@lsu.edu |

      **RE: Dr. Brian Salvatore**  
           **Our file no. 23-32**

Dear Dr. Smith:

     Pursuant to LSUS Policy Statement 2.19.02, Dr. Salvatore submits the following response to the charges alleged in LSUS's November 8, 2023 correspondence as follows:

I. **DR. SALVATORE'S SPEECH IS PROTECTED BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

     On behalf of Dr. Salvatore, we submit that all of the speech which you allege as the basis of Dr. Salvatore's proposed termination is protected by the First Amendment. The following Court decision demonstrate that essential point:

*PICKERING V. BOARD OF EDUCATION*, 391 U.S. 563 (1968)

The Board alleges that numerous statements in the Plaintiff's letter to the local paper were false and that these statements unjustifiably impugned the motives, honesty, integrity, truthfulness, responsibility and competence of both the Board and the school administration. *Id.* at 566, 567.

The Court agreed that certain statements in the Plaintiff's letter were false. *Id.* at 570.

"It is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech." *Id.* at 574.

**EXHIBIT 2**

"In sum, we held that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574.

In <u>*COLOSON V. GROHMAN*, 174 F.3d 498 (5th Cir 1999),</u>

The Fifth Circuit held that "criticism of public officials lies at the very core of speech protected by the First Amendment." *Id.* at 507. "Even charges of criminal conduct against an official or candidate are constitutionally protected." *Id.* at 507.

In *New York Times Co. v. Sullivan, supra,* the Court stated: "That this country enjoys a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

<u>*UNITED STATES. V. ALVAREZ,* 567 U.S. 709 (2012)</u>

"As a general matter, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. As a result, the Constitution demands that content-based restrictions on speech be presumed invalid and that the Government bears the burden of showing their constitutionality." *Id.* at 716-717.

". . . content-based restrictions on speech have been permitted, as a general matter, only when confirmed to the few historic and traditional categories of expression long familiar to the bar." Among these categories are advocacy intended and likely to incite imminent lawless action, obscenity, defamation, speech integral to criminal conduct, so-caused "fighting words", child pornography, fraud, true threats, and speech presenting some grave and imminent threat the Government has the power to present. *Id.* at 717-718.

There is no exception to the First Amendment for false statements. Id. at 718, 719. "This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views or public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718

For a defamatory statement to be outside of the First Amendment, the statement must be a knowing or reckless falsehood. *Id.* at 719.

Suppression of speech by the Government can make expression of falsity more difficult, not less so society has the right and a civil duty to engage in open, dynamic, and rational discourse. These ends are not well served when the Government seeks to orchestrate public discussion through content-based mandates. *Id.* at 728.

2

*SERFIRNE V. BRANARM,* 810 F.3d 354 95th Cir. 2016)

"Indeed, the Court has long held that 'erroneous statement is inevitable in free debate, and. . .it must be protected if freedoms of expression are to have the 'breathing space' that may need." *Id.* at 362.

*NEW YORK TIMES V. SULLIVAN,* N.Y. Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)

The Court held that an advertisement in the Times which was allegedly defamatory qualified for constitutional protection. The Court held that the question before the Court was whether the advertisement forfeited First Amendment protection by the falsity of some of its factual statements and by its alleged defamation of the Plaintiff. *Id.* at 271.

The United States Supreme Court held that a defamatory falsehood only loses First Amendment protection if the statement is made "with actual malice – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-280.

This privilege fully applies to the "citizen-critic of government." *Id.* at 282.

In *KENNEDY V. SHERIFF OF EAST BATON ROUGE,* 05-C-1418, (La. 7/10/06), 935 So.2d 669,

The Louisiana Supreme Court observed that the *New York Times v. Sullivan* decision imposed a requirement of a heightened burden of proof and a "high degree of fault" on the part of the speaker. *Id.* at 675.

The Louisiana Supreme Court also observed that the *New York Times v. Sullivan* decision also applied to critics of. . .official conduct." *Id.* at 677.

The Louisiana Supreme Court also held that the need for a constitutional privilege to protect "uninhibited, robust and wide-open debate obtains in either case." *Id.* at 678.

*GARCETTI V. CEBALLOS,* 547 U.S. 410 (2006)

"It is now well settled that 'a state cannot condition public employment on a basis that infringes the employee's constitutional protected interest in freedom of expression." *Id.* at 413.

However, the Court held that the First Amendment does not protect a government employee from discharge based on speech made pursuant to the employee's official duties."

In *LANE V. FRANKS,* 573 U.S. 228 (2018),

The United States Supreme Court held that "the question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duty, not whether it merely concerns these duties." *Id.* at 240.

3

"*Pickering* provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases were the government seeks to curtail the speech of its employees." *Id.* at 236.

"It bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees or subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id.* at 240.

<u>ANDERSON V. HALDEY, 845 F.3d 560 (5th Cir. 296)</u>

"A public employee does not speak pursuant to his official duties merely because he speaks within at work. Likewise, a public employee does not speak pursuant to his official duties merely because he speaks about work." *Id.* at 593.

". . .*Garcetti* and our Court's pre-*Lane* jurisprudence established that when employees speak outside of their chain of command and outside of their job duties they are entitled to First Amendment protection." *Id.* at 602.

<u>WALKER V. SMITH, 801 Fed. Appx. 265 (5th Cir. 2020),</u>

"If. . .a public employee takes his job concerns to persons outside the workplace in addition to raising them up the chain of command at his workplace, then these external communications are ordinarily not made as am employee, but as a citizen."

## II.    <u>DR. SALVATORE'S RESPONSES TO THE INDIVIDUAL ALLEGATIONS</u>

Regarding each specific allegation, Dr. Salvatore responds to each, individually, as follows:

**1. In Spring 2021, Dr. Salvatore alleged improprieties by LSUS concerning removal of chemical waste from the Science Building. This was investigated by the LSU Office of Internal Audit. The allegations were found to be unsubstantiated with no further investigation warranted.**

As Department Chair at the time, Dr. Salvatore had helped collate the chemicals that the faculty had designated for removal from the Department of Chemistry and Physics, and he consulted with other faculty about what the Biology Department had designated for removal. The reason that he asked the LSU auditor to investigate this matter was that he had conversations with several other faculty members, and they believed that Chancellor Clark was reporting exaggerated numbers when he spoke about the amount of chemicals that had been removed from the Science Building over the two preceding years. Several faculty and staff had expressed concerns to Dr. Salvatore that the weights of the chemicals were being inaccurately reported by the Facilities Director (Art Shilling) and Chancellor Clark. The concerned individuals that spoke to him about this included Kathi Garcie, the department's administrative assistant, and Chris Stratton, a former staff member who had assisted with the Facilities Director with the chemical

waste removal. They expressed the belief that the amounts being reported (in pounds) were erroneous and exaggerated.

Dr. Salvatore later obtained the electronic manifests from the EPA that itemized all the chemicals that had been removed from LSUS during all of 2020-2021. The discrepancy in pounds was greater than 50%. Also, the Department estimated that about 70% of the weight on the EPA spreadsheet was from packaging, and not chemicals. Later, he obtained the spreadsheets from the EPA that showed everything that had been removed (along with the weights), but he did not have those at the time of the investigation. Dr. Salvatore needed to obtain the EPA spreadsheet from a third party, because the University did not provide that to him. Before he had this information, the auditor asked Dr. Salvatore to provide him with proof of the alleged discrepancy, and Dr. Salvatore told him that he was not involved in weighing the chemicals. Dr. Salvatore asked the auditor to please just verify what had been reported by the Chancellor with what the University's own manifests showed. The auditor never provided Dr. Salvatore with a copy of his investigative report, even though he was the individual who had requested the investigation in the first place. Dr. Salvatore does not believe that an adequate investigation was conducted, and based on the information that was available to him at the time, he believed that this was not proper.

**2. Also in Spring 2021, Dr. Salvatore alleged that he had several photographs of a deceased former employee that he claimed were stolen from his Apple iCloud account. He accused the LSUS administration as being behind the theft. At the time, then-Chancellor Larry Clark directed LSUS Police Chief Donald Wray to conduct a criminal investigation. The criminal investigation (which included a forensic analysis of Dr. Salvatore's cell phone) found this allegation to be unsubstantiated. The case was closed with no further investigation warranted.**

The deceased former employee was Dr. Michael Doran, the Chair of LSUS's Computer Science Department, whom Dr. Salvatore discovered deceased in his home. Dr. Salvatore knew that Dr. Doran had been placed under inordinate stress during the year that he worked for the University. Dr. Doran had informed him that that two of his colleagues were being insubordinate to him, and they were not helping at all in their department's ABET accreditation process. Dr. Doran informed him that he reported the matter to the administration on a nearly daily basis, but nothing was ever done to help him. Dr. Peter Siska, the Dean of Arts and Sciences at the time, did try to help him, even calling an emergency meeting with all the department chairs to try to get Human Resources and the administration to do something about this crisis. However, no one in the administration ever did anything to help Dr. Doran, to Dr. Salvatore's knowledge.

The last time that Dr. Salvatore saw Dr. Doran alive, he looked like a ball of nerves, and Dr. Salvatore believed that he was under tremendous stress. His wife, who was away from home at the time, had asked Dr. Salvatore to check on him roughly one week after the last time he saw Dr. Doran. Tragically, Dr. Salvatore found him dead in his bedroom on that Sunday, apparently from a massive heart attack. Dr. Salvatore believes that the photographs he took that day were deleted from his personal Apple iCloud. He suspects that this was done by an LSUS IT staff member who gained access to his university-owned laptop, using the administrator access account. Dr. Salvatore believes that a staff member then used that access to enter his personal

5

iCloud account and delete the photos. Dr. Salvatore is not aware that anyone, other than the University Administration, had access to his personal iCloud account.

Chief Wray, with the Bossier Police Department, informed Dr. Salvatore at the time that he was conducting this investigation for him, personally. He encouraged him to provide the Chief with his iPhone. Chief Wray then took his phone to the Bossier Police Department, and they kept it for three (3) days. Shortly after it was returned to Dr. Salvatore, Chief Wray said that there was no evidence that any photos from his iPhone had been "emailed around the campus by the administration." Dr. Salvatore responded he had never asked if photos had been emailed around. Rather, he wanted to know if they had been deleted from his personal Apple iCloud account. Chief Wray replied "Oh, if you want to know that, then we would need to destroy your phone. Dr. Salvatore agreed and told the Chief to go ahead and destroy his phone because he wanted to know the truth.

Roughly two weeks after he described this incident (and repeated Chief Wray's words) to university investigators who were questioning me about another matter, it was announced that Chief Wray was leaving LSUS.

**3. Also in Spring 2021, Dr. Salvatore filed a grievance in which he accused then-Chancellor Clark of making inappropriate sexual advances toward Dr. Elahe Mahdavian (Dr. Salvatore's wife). This allegation was investigated by several different bodies: the LSUS Title IX Office, a faculty committee and Mr. Carranza Pryor, Chief Counsel for LSU Health Shreveport. No evidence was found to substantiate the allegation. However, Dr. Salvatore has continued to publicly make the allegation.[1]**

Based on information provided to Dr. Salvatore by his wife, Dr. Salvatore believes that Chancellor Clark had behaved very unprofessionally towards his wife, Dr. Elahe Mahdavian, who is also a professor at LSUS. She has told Dr. Salvatore about his behavior on numerous occasions. At first, he was dismissive of her concerns, but then, as he personally observed Chancellor Clark's behavior, Dr. Salvatore began to believe that he had, in fact, been trying to make advances toward her.

For example, Dr. Salvatore caught Chancellor Clark following his wife alone at night in the University Center parking lot as she left an event called "India Night." The Chancellor and Graduate Dean Sanjay Menon had provided the couple with free tickets to attend India Night and to sit at the Chancellor's table that evening. However, Chancellor Clark didn't sit there much at all. Instead, he stood about 30 feet away much of the night, and Dr. Salvatore's wife later said that he kept leering at her and blushing.

When they were getting ready to leave that event, Dr. Salvatore left first to check on a chemical reaction in a research lab in the Science Bldg. He told him that they would meet at their car in ten (10) minutes so that they could go home together. When he arrived at the car, he found the Chancellor alone with his wife beside the car. Dr. Salvatore said "Oh, hi" as he came up behind him. The Chancellor looked startled, and he did not say a word. He just turned around and walked hurriedly back to the event. Dr. Salvatore's wife said that he had followed her out of

the event alone. They both thought it was strange, but they did not give it much further thought until he continued to pursue her.

Dr. Salvatore's wife submitted an EEOC claim regarding Chancellor Larry Clark in 2021. He fully believes that Elahe is a truthful and honest person, and he has no reason to believe otherwise.

Dr. Salvatore did file a grievance against the Provost in March 2021. Chancellor Clark would have been the ultimate decision-maker in the grievance process, and because of the personal circumstances with Dr. Salvatore's wife, it made sense to Dr. Salvatore that the Chancellor would recuse himself. Dr. Salvatore mentioned this fact in his grievance. After a news article came out about the grievance, it is noteworthy that the Provost chose to send Dr. Elahe Mahdavian's EEOC investigation file out to the entire university.

**4. In March 2022, Dr. Salvatore alleged that a workplace injury to his administrative assistant was caused by William Wolfe, Associate Vice Chancellor HR, Purchasing, and Risk Management. The allegation stated that Mr. Wolfe had imposed a very short deadline to submit a property inventory and that Mr. Wolfe had put pressure on his assistant causing her to injure herself in a lab. The evidence showed that Mr. Wolfe had never communicated with Dr. Salvatore's assistant concerning the inventory. One month was permitted for all departments to conduct the inventory. When asked for evidence to substantiate his allegation, Dr. Salvatore was non-responsive.**

The reason that Dr. Salvatore made this allegation is because Kathi Garcie, his administrative assistant, injured herself in the lab. While he was driving her to get stitches for her injury, she informed him that she felt like she had been placed under stress to complete the departmental inventory in a rush. She mentioned the pressure that Bill Wolfe placed on the administrative staff. Dr. Salvatore had been informed that Mr. Wolfe had threatened employees who were late in getting their property inventory sheets turned in. Sometimes he did this by insinuating that they must be trying to cover up the theft of state property when all the staff was doing was trying to locate everything and do a thorough job of conducting the property inventory.

Ms. Garcie expressed to Dr. Salvatore that she felt threatened by Bill Wolfe. Many other classified and unclassified staff at LSUS have also informed him that they felt threatened by Wolfe.

**5. In November 2022, after he was not recommended for a sabbatical by a faculty committee, Dr. Salvatore sent a series of scathing emails to the Selection Committee Chair (Dr. Binshan Lin, an eminent scholar) calling him incompetent, demanding that he should resign, and questioning the integrity of the Selection Committee. Dr. Salvatore's actions were subsequently discussed in a special meeting of the LSUS Faculty Senate, and ultimately resulted in his formal censure by the Senate.**

Several science faculty members were very upset about the grant and sabbatical application evaluation process overseen by Dr. Binshan Lin's Faculty Research and Development Grant Committee (FRDGC). Some of these individuals asked Dr. Salvatore (as their Faculty Senate

representative) to see that the FRDGC accounted for their performance in reviewing the proposals.

Dr. Lin was invited to explain and justify his committee's actions during the October 2022 Faculty Senate meeting. Dr. Salvatore thought that he did a very poor job there, and no one confronted Dr. Lin about his admission that his committee lacked the qualifications to adequately evaluate scientific proposals.

Following that meeting, Dr. Salvatore sent an email to Dr. Lin and Faculty Senate President Allen Garcie how the committee's decisions could be appealed. He also asked if Chancellor Clark had contacted any members of the committee during the review process and interfered with the fair evaluation of the proposal applications. Dr. Lin refused to answer either question. Dr. Salvatore asked Faculty Senate President Garcie to respond to the first question, and he simply ignored the request. It was only after his questions were repeatedly ignored by both Binshan Lin and Allen Garcie that Dr. Salvatore sent an email to Binshan that referred to the FRDGC entire process as "corrupt" and "incompetent". He had every reason to believe in the accuracy of these opinions. He recommended to Dr. Lin that he resign as chair of that committee. Dr. Lin ultimately did follow the advice and resigned.

**6. In November 2022, at the beginning of a class session, Dr. Salvatore made the following announcement to the students in his class:**

> **"So, this is my twentieth year at LSUS and it is very likely my last. Of course, my wife will be leaving too. Dr. Gustavson will be leaving as well. This administration, beginning at the top with Larry Clark, who himself is in his terminal year, has damaged the science program significantly. Throwing money into a cyber collaboratory that barely gets used... millions of dollars while neglecting this department ... and acting like a tyrant. I know two faculty who were at the point of suicide from the treatment from Larry Clark. So, there's EEOC cases filed against him and everything.[2] So, I've pretty much had it, and as it stands right now, I have more dignity than to teach for people like this, including our Dean... "**

**Because of the seriousness of such an allegation, Dr. Salvatore was immediately asked to meet with both his department Chair and his Dean. During this meeting, he was asked to name the faculty members he was referring to. He did so reluctantly, but continued by saying he did not believe these individuals were contemplating suicide. In that meeting, Dr. Salvatore again accused Chancellor Clark of inappropriate behavior with his wife.**

Dr. Salvatore was very frank with his students that day about the situation at LSUS and his feelings at the time. He had planned to retire until he was informed by HR that it was too early to do so to retain my health insurance benefits. Dr. Salvatore was very concerned about how Chancellor Larry Clark had treated certain faculty members, placing them under significant

---

stress. During his meeting with the Dean and Department Chair, the only reason that he may have appeared hesitant to divulge the names of the two faculty whom he knew had been driven close to the brink of committing suicide was that he did not wish to violate their confidentiality, but what Dr. Salvatore said was the truth. Currently, Dr. Salvatore is concerned about the emotional state of another faculty member who has also been targeted by the administration.

**7. In December 2022, following a negative review of a grievance filed by Dr. Salvatore by a faculty panel, Dr. Salvatore took it upon himself to contact editors at the internationally recognized Oxford University Press (OUP), reporting plagiarism allegedly committed by Dr. Alex Mikaberidze, a highly published and internationally renowned member of the LSUS History faculty who served on the faculty panel. OUP conducted an investigation of Dr. Salvatore's claims, only to determine that no plagiarism had taken place. Given that History is well outside of Dr. Salvatore's own discipline of Chemistry, it is quite apparent that Dr. Salvatore's efforts were intended solely to tarnish the reputation of a prominent colleague, in apparent retaliation for Dr. Mikaberidze's service on the grievance committee that found against Dr. Salvatore. Dr. Salvatore also pursued the same claims of plagiarism with Red River Radio, which paused Dr. Mikaberidze's Red River Radio show until the allegations were disproven.**

It is Dr. Salvatore's belief and opinion that Dr. Alex Mikaberidze repeatedly committed plagiarism in his radio show entitled, "Treasures of the Noel". This show was broadcast weekly on Red River Radio and repeated on other occasions throughout the week. Red River Radio is a National Public Radio (NPR) affiliate, with the second largest broadcast area of any NPR station in the nation.

Dr. Salvatore listened to the NPR station while he worked in the lab. He discovered Dr. Mikaberidze's plagiarism by recognizing blatant factual errors in some of the episodes of his radio show, and he began investigating the sources of those errors. Dr. Salvatore found that the errors originated from the sources that Dr. Mikaberidze had plagiarized, word for word.

Dr. Salvatore first reported the plagiarism to the radio station's Executive Director, to the University's Policy and Personnel Committee and to the Chair of the Department of History, Dr. Mikaberidze's departmental supervisor. No one did anything to investigate the report. The radio station's Executive Director went to speak to Chancellor Clark, who was his supervisor. He did cancel "Treasures of the Noel", and he deleted all the series' episodes from the station's web-based archives.

Dr. Salvatore based his beliefs and opinions on Amazon.com book review and the audio transcript of Dr. Mikaberidze's radio episode about a book by Mary Pickford, which is owned by the Noel Collection. Dr. Salvatore also obtained evidence that at least three (3) other episodes in this radio series were plagiarized and taken from an advertisement for a book that was written by a rare bookseller in Oregon.

His motivation to alert the publisher had nothing to do with Mikaberidze's "service" on any grievance committee. Dr. Salvatore proudly upholds a stricts standard of academic integrity for his students and he was appalled that there would be a seemingly non-existent standard of

integrity for faculty members. The University did not conduct any credible investigation into Mikaberidze's plagiarism.

**8. March 23, 2023: Dr. Salvatore publicly posted the following on his social media:**



On March 22, 2023, Dr. Salvatore then forwarded a screenshot of his post to the LSU President and others. Dr. Salvatore's claims are unsubstantiated and defamatory. In fact, it has been confirmed that no LSUS hazardous waste has been disposed of by the open-burn method. In addition, no LSUS hazardous waste has ever been sent to Clean Harbors Colfax or any Clean Harbors location in Louisiana. On April 4, 2023, Mr. Blake Rodgers, LSUS Director of Environmental Health & Safety, informed Dr. Salvatore by email that he was incorrect concerning his Colfax post. Dr. Salvatore chose to neither correct nor remove his post. On May 17, 2023, Chancellor Clark sent an email message to Dr. Salvatore to inform him that he had written a Letter of Reprimand to Dr. Salvatore's

**LSUS personnel file. Chancellor Clark directed Dr. Salvatore to note his instruction to him within the letter that he correct or remove the Colfax post. As of this date, Dr. Salvatore has neither corrected nor removed the post. Finally, when Dr. Salvatore met with me on August 1, 2023, he repeated these same false claims regarding hazardous waste. This behavior demonstrates his reckless disregard for the truth, as well as his insubordination and contempt for authority.**

From 2014-2017, Dr. Salvatore worked with a group of concerned citizens to prevent what would have been the largest open burn of hazardous chemicals in the history of the U.S. It would have created an environmental disaster in this region. This plan amounted to open burning of nearly 20 million pounds of cold-war era propellants that had been dumped off at Camp Minden by the U.S. Army. The state contractor at Camp Minden did not do what they were supposed to do with the chemicals, and they simply allowed them to sit in the field for several years. The chemicals eventually became unstable and began spontaneously exploding. These were massive explosions; one was heard 30 miles away. The EPA decided that the hazardous chemicals must all be burned on-site. The concerned citizens disagreed, and they identified a state-of-the-art contained burn system that was ultimately adopted and installed on-site.

The chemicals were safely destroyed within one (1) year. However, about 450,000 pounds of hazardous chemicals (mostly tritonal) was secretly sent to Clean Harbors Colfax to be open burned right next to an enclave of African American residents in a community called "The Rock". The concerned citizens were outraged, as were other people in central Louisiana. There are safer alternatives for destroying tritonal, but the EPA and the Louisiana National Guard failed to consider any of those alternatives. In this instance, they prioritized expediency over public safety.

Dr. Salvatore and other concerned citizens have been lobbying the state and federal government for Clean Harbors to install a safe contained burn system in Colfax, but they have not done so. He has attended many meetings, and he even testified with General Russel Honoré at two separate Louisiana legislative committee hearings to try to get legislation introduced to put a stop to the open burning in Colfax.

In December 2019, when Dr. Salvatore saw a Clean Harbors truck pull up to the loading dock at LSUS to remove their hazardous chemicals, he became very concerned. He did not want to allow the people in Colfax to be harmed again, especially by chemicals being disposed of by his employer, where he was serving as the Chair of the Department of Chemistry and Physics at the time. Dr. Salvatore immediately sent an email to the University's Facilities Director, Art Shilling, asking him to ensure that none of the chemicals from LSUS would be going to Clean Harbors Colfax. Mr. Shilling stated that he could not tell Dr. Salvatore that information, and he asked other people to respond to Dr. Salvatore's inquiry. At the time Mr. Shilling wrote that, Dr. Salvatore was already aware that Clean Harbors had over 1,500 air, water, soil, and safety violations with the Louisiana Department of Environmental Quality at their Colfax facility, and that their permit has since been denied. This caused Dr. Salvatore significant and legitimate concern and alarm, as a person who worked hard to protect many populations from the damage of pollution. Mr. Shilling also carbon copied several other people at LSUS on his message, including his supervisor (the Vice Chancellor for Business Affairs), the Dean of Arts and

Science, the Chair of the Dept. of Biology, the Provost, and the Chancellor. However, for three (3) years, none of these individuals ever responded to Dr. Salvatore about this, nor did they ever express any concerns nor offer any assurances whatsoever about any chemicals being taken to Colfax.

> From: "Shilling, Art" <Art.Shilling@lsus.edu>
> Subject: Re: Hazardous Waste Inventory process to start Monday 12-9-19
> Date: December 7, 2019 at 10:54:06 AM CST
> To: "Salvatore, Brian" <Brian.Salvatore@lsus.edu>
> Cc: "Taylor, Helen" <Helen.Taylor@lsus.edu>, "Banks, Stephen" <Stephen.Banks@lsus.edu>, "Clark, Larry" <Larry.Clark@lsus.edu>, "Stratton, Christopher" <Christopher.Stratton@lsus.edu>, "Szarvas, Tibor" <Tibor.Szarvas@lsus.edu>, "Cannon, Barbie" <Barbie.Cannon@lsus.edu>
>
> Dr. Salvatore,
> Clean harbors is licensed by the federal environmental protection agency as well as license and permitted to operate their facility in Louisiana by the Louisiana Department of environmental quality. They are a hazardous waste transportation and disposal facility that is currently contracted by the Louisiana state university system in Baton Rouge. We are listed on the LSU Baton Rouge contract to utilize this vendor in accordance with the LSU contract.
> I am afraid that any decision regarding The use or non-use of clean harbors as the transportation and disposal company for LSUS hazardous waste is far above my pay grade and I will defer to the executive leader ship contained in this email and await instructions.
> Thank you,
> Art
>
> Sent from my iPhone
>
> On Dec 6, 2019, at 6:42 PM, Salvatore, Brian <Brian.Salvatore@lsus.edu> wrote:
>
> Art,
>
> Can Clean Harbors please provide us with details about how they intend to dispose of this hazardous waste? This company operates in a very unethical manner and open burns hazardous chemicals near Colfax, Louisiana. Louisiana is the only state in the nation that allows company to dispose of hazardous materials by open burning them, and I would not approve of LSUS participating or contributing to such actions.
>
> I know people in Colfax who are suffering from cancer and thyroid disease from the careless actions of Clean Harbors, and I would strongly recommend not allowing LSUS's name to appear on any of this company's receiving manifests in Colfax, because the citizens there are currently pursuing punitive legal action against this company.
>
> It would not be ethical for LSUS to send any hazardous materials to be disposed of in Colfax. If Clean Harbors intends to ship any hazardous materials from LSUS to Colfax, my recommendation would be to cancel the contract with them immediately and please use another disposal company that operates ethically.
>
> Thank You,
> Brian

Clean Harbors continued to come to our campus to remove hazardous chemicals over the next three (3) years, and Dr. Salvatore continued to express concerns to people about where the chemicals were being taken. No one ever responded to his concerns during those three years, even though Mr. Shilling requested that higher-up members of the university respond to his concerns. Finally, in December 2022, Dr. Salvatore approached a "certified expert" from Clean Harbors who was removing the hazardous chemicals from our science building. He asked him if any of these chemicals would be taken to Colfax. The expert responded that he didn't know, and he could not tell Dr. Salvatore that. When he looked at the inventory of the chemicals being removed, many of them shared the same codes and chemical functional groups as the compounds that were taken from Camp Minden to be burned in Colfax in 2015, and Dr. Salvatore believed that some of LSUS's chemicals were being taken to Colfax as well.

Finally, after he made a social media post in March of 2023 (over 3 years after his initial email to our Facilities Director, Chancellor, etc.), someone from the university finally responded to his concerns. Blake Rogers claimed that none of the chemicals from our campus had been taken to Colfax. However, it seemingly took a post by Dr. Salvatore on social media to get anyone from LSUS to pay any attention to his concerns. As soon as he received that response in his e-mail, Dr. Salvatore removed his post from social media, even though he was never provided with any evidence to support what Mr. Rogers said. He simply took him at his word, but Mr. Salvatore's concerns up until that point were valid.

The other item was just a comment on another post, which was not removed). The social medial post indicated that LSUS was sending chemicals to Clean Harbors, a company that was

12

involved in open burning hazardous chemicals in Colfax. Dr. Salvatore personally observed the University sending chemicals to Clean Harbors. He believed that this was true, and no issue was ever raised as to its accuracy. He never posted anything to social media, nor maintained any information that was confirmed as inaccurate or untrue. He did not make any false statements to LSUS Chancellor Smith in August 2023. Dr. Salvatore has that entire conversation recorded, and he can provide that recording upon request.

General Russell Honore, having worked with Dr. Salvatore in this matter, has provided insight into his experience with Dr. Salvatore. He states that, as a professor with his background, Dr. Salvatore understands the impacts that this had on the people and the community. Dr. Salvatore visited Colfax and spoke to the people about the pollution in their area, and he provided substantial information and helped to get others involved. Dr. Salvatore did a lot of this in his own time, not getting paid. He was simply a concerned citizen and wanted to help and inform the people of that community. He gave a statement on the potential impact that an ammunition burn would have on the land, and his statement was taken at the House of Natural Resources and Environment Committee. Dr. Salvatore was also active in the Facebook video conference that led an effort to "Stop the Burn." He would provide scientific input on how the chemicals affected people's health. He also did work in St. Charles Parish to help defend fisherman's rights to their land. He also made efforts to help Native American transition into their new home and made efforts to help them preserve their culture. He gave a voice to the people of Louisiana and helped them deal with pollution. Having experts like Dr. Salvatore come into these communities to talk about the impact of chemicals on people's health meant a lot to the citizens of this State. General Honore feels that Dr. Salvatore was passionate, and that his opinions were well founded and factual. He should not be fired over having a reasonable opinion.

**9. In September 2023, in public comments he made at the Shreveport Mayor's Capital Improvement Committee (chaired by Chancellor Emeritus Larry Clark), Dr. Salvatore claimed that an LSUS faculty member (unnamed, but clearly referring to Dr. Alex Mikaberidze) "committed plagiarism in speaking about the Noel Collection in public radio broadcasts". He also made vague, yet serious charges against Chancellor Emeritus Clark, stating that he had "caused tremendous psychological distress to several faculty and staff on the LSUS campus, often saying things knowing full well that he was either not telling the truth or else he knew far more to the contrary than he let on at the time". Such incendiary public statements, made with reckless disregard for the truth, as well as the AAUP statement on academic freedom, damage the reputation of LSUS, as well as the individuals referred to in his diatribe.**

Please see the attached document (Exhibit A), containing Dr. Salvatore's prepared public comments before the Shreveport Mayor's Capital Improvement Committee, which he delivered on Thursday September 7, 2023. He stated at the beginning of his comment period that I was speaking as a citizen here and not as an employee or a representative of the University. Everything that he said in this statement is true. He has already provided evidence about the plagiarism committed by Alex Mikaberidze on Red River Radio.

Dr. Salvatore has significant personal and professional differences with Larry Clark.

He does not believe that Chancellor Clark has been upfront or honest in his dealings with his personally, and he believes that a lot of faculty and staff at LSUS feel that Chancellor Clark is not a transparent individual.

Clark caused tremendous psychological distress to several faculty and staff on the LSUS campus, often saying things that Dr. Salvatore believes to be untruthful.

He appointed people to positions they had no experience or ability to be in, such as a Provost who had never even served as a department chair or dean, as well as a Chief Financial Officer and a Facilities Director who had never worked at a university before. He appointed the Provost without conducting a search. He also appointed a faculty member to head the Noel Rare Book Collection who had absolutely no experience with rare books, and that individual ultimately committed plagiarism in speaking about the Noel Collection in public radio broadcasts.

Dr. Salvatore believes that Chancellor Clark often contradicted himself, and violated LSU policies on numerous occasions. He condoned the violation of the state open meetings law, and he even attended numerous meetings himself that were organized by people under him or affiliated with him where open meetings law was violated.

He often behaved inappropriately, once calling one of our Deans a bozo to his face in a mean-spirited attack, claiming that he was conveying the words of someone from the LSU Medical School, which was never shown to be true.

When he removed that Dean, his second in command, Provost Helen Taylor, inaccurately stated to all the faculty and staff in our college the reasons for that Dean's removal.

**10. In September 2023, Dr. Salvatore called Staff Senate President Matthew Culpepper to warn him that he was violating the Louisiana Open Meetings law. Mr. Culpepper had been acting under the advice of LSU Legal Counsel at the time. Mr. Culpepper then registered a complaint with the LSUS Human Resources Office, noting that on the call, Dr. Salvatore became increasingly accusatory and hostile, before he finally hung up on Dr. Salvatore. Mr. Culpepper informed HR that "the prospect of Dr. Salvatore threatening him in the future was making him consider resignation from LSUS". This constitutes bullying of Mr. Culpepper by Dr. Salvatore.**

On the morning of Sept. 7, 2023, Dr. Salvatore called Staff Senate President Mr. Matthew Culpepper, to inform him about the wording in the *Staff Senate Constitution and Bylaws*, which required that the Staff Senate Executive Committee meet to approve the agenda for each Staff Senate meeting. Mr. Culpepper's response was that they did not need to meet openly, but rather they have instead held some "social gatherings." Dr. Salvatore did not become accusatory nor hostile towards him. He simply tried to inform him that any exclusive "social gatherings" of the Staff Senate officers did not qualify as an open meeting of the Executive Committee. Dr. Salvatore further tried to inform him that if these "social gatherings" did not have any published agendas or minutes, nor even an announcement so that others could attend, then they were not being held in accordance with Louisiana's Open Meetings Law. However, before he could finish

his sentence, Mr. Culpepper said "I don't need to get into this with you, Dr. Salvatore", and he immediately hung up on him.

Dr. Salvatore never threatened Mr. Culpepper, but he did follow up that phone conversation with an email that afternoon, explaining the basis of Louisiana's Open Meetings Law to him. In that email, Dr. Salvatore also informed him that he could file a complaint about this matter with the state Attorney General's office, but he had not yet done so.

The Staff Senate now only accepts agenda items anonymously, and there is no transparent mechanism for how any item makes it onto a Senate meeting agenda. Dr. Salvatore believes that this requirement for "anonymity" is just a device to avoid holding any open meetings of the Executive Committee. A lack of anonymity was never a problem for any of the staff members with whom he have spoken. Rather, the problem is that staff members (particularly classified staff) have tried to get items on the agendas for the Staff Senate meetings, and those items have not been placed on the agendas, without any discussion as to why. Dr. Salvatore believes that this violates the *Staff Senate Constitution and Bylaws*, and it has occurred repeatedly.

**11. On October 2, 2023, Dr. Salvatore copied Faculty Senate President Dr. Cassie Williams (an untenured assistant professor) on an email sent to Ms. Amanda Lewis, the LSUS Director of Research and Sponsored Programs, in which he accused Dr. Williams of violating both policy and the law. In the note, he observed in reference to Dr. Williams that "an assistant professor who is violating both policy and law here is jeopardizing her very prospects for tenure". Dr. Williams filed a complaint with LSUS Human Resources, noting that Dr. Salvatore was threatening to negatively influence her tenure process. This constitutes bullying of Dr. Williams by Dr. Salvatore.**

Dr. Salvatore has never bullied Dr. Cassie Williams. He only informed her that she was not following the *Faculty Senate Bylaws*, which mandate that the Faculty Senate Executive Committee must meet to prioritize the agenda items for full Senate meetings. Dr. Salvatore had been informed about one secret meeting of the Faculty Senate Executive Committee by his department's administrative assistant, Kathi Garcie, who is the spouse of our past Faculty Senate President, Allen Garcie. She told Dr. Salvatore that both Provost Taylor and Chancellor Clark had come to a Faculty Senate Executive Committee meeting in the Fall of 2021, said derogatory things about Dr. Salvatore to the committee, and tried to discourage the members of the committee from allowing the full Senate to discuss the very serious mold problems that we had been having in the Science Building. Dr. Salvatore understands that this Executive Committee meeting was held in secret with the administration. Notwithstanding the adjectives and the exaggeration employed in the pre-termination letter, the fact of the matter is that his words are pure speech protected by the Frist Amendment.

As Faculty Senate President during the current (2023-2024) academic year, Cassie Williams has continued to repeat the improper actions of her predecessor. However, it is not accurate to say that Dr. Salvatore bullied Dr. Williams. Rather, Dr. Salvatore feels that the Faculty Senate treated him unfairly in December 2022 when they censured him for his complaints about the incompetent way that internal grants and faculty sabbaticals were awarded last year. During that

"special meeting" they voted by secret ballot to censure him. Secret ballots in open meetings are illegal under La. R.S. 42.

**12. On Sunday, October 29, 2023, Dr. Salvatore submitted an email report to the LSUS Police, alleging that more than one thousand files were stolen or deleted from his university-issued laptop computer. He alleged that this was done "by someone who was provided with the administrative security clearance to enter (his) laptop through the 'administrator' account and the network on which (his) computer was connected at the time." Dr. Salvatore further alleged that this was "not the first time that something like this" had occurred, further alleging without evidence that then-University Police Chief Wray had "obstructed the investigation". University Police immediately initiated an investigation of the current complaint, ultimately requesting Dr. Salvatore to submit his university-issued laptop computer to police, so that a forensic analysis could be conducted. Dr. Salvatore declined to submit his computer for analysis, however, precluding police from completing the investigation. Further, on the morning of October 30, Dr. Salvatore spoke with an IT staff member who he had run into while the staff member was doing some technology maintenance in a classroom. He told the staff member about the alleged theft of files and then accused Interim Vice Chancellor and CIO Shelby Keith and Provost Helen Taylor of being behind the theft. He then asked the staff member to not tell anyone. The staff member was sufficiently concerned about this conversation that he reported it to his supervisor, Interim Vice Chancellor and CIO Shelby Keith.**

On the afternoon of Sunday October 29, 2023, while Dr. Salvatore was at home recording online lessons, over 20,000 computer files that belonged to me were deleted, not only from the university-owned laptop that I was using but also from my home network-based hard-drive backup system. This was Dr. Salvatore's intellectual property. It included everything in his "LSUS Teaching" folder, which included every lecture he ever gave at LSUS for the past 21 years, along with his research proposals and manuscripts, and even his state and federal tax returns and medical records (e.g., complete genome sequence). On Oct. 30th, Dr. Salvatore reported this to the LSUS Campus Police, who were of no help. The Chief of the Campus Police is supervised by LSUS Vice Chancellor for Business Affairs, Mr. Shelby Keith, who also serves as the Director of IT Services at the University.

In light of his prior experience with Police Chief Wray relative to the prior deletion of his electronic communications, Dr. Salvatore declined to agree to Wray's request for a forensic examination of the laptop and hard drive. Instead, he preferred to have this examination conducted by an independent forensic expert.

**13. On November 1, 2023, three liberal arts department chairs wrote to the Faculty Senate President, their dean, the Provost and Chancellor to indicate that their faculty senators were contemplating resignation from the Senate due to the "challenging and toxic atmosphere that has unfortunately pervaded the Senate", an atmosphere that has single-handedly been made toxic by Dr. Salvatore. The chairs went on to say that in light of this, they "will not encourage any of (their) faculty members to serve on the Faculty Senate until significant improvements are made to the working environment and the overall atmosphere becomes more conducive to productive and respectful discourse". This extraordinary step**

is an indication of the extent to which Dr. Salvatore has poisoned the environment in the Senate. His callous disregard for even the most basic level of propriety has thus seriously degraded the ability of the Faculty Senate to function. Given the critical role of shared governance on a university campus, this is intolerable.

Dr. Salvatore believes that Chancellor Robert Smith ignored state open meetings law and allowed the Faculty Senate, Staff Senate, and Provost's Council to disregard their responsibilities to adhere to the precepts of this law. Also, when Chancellor Smith was shown the law and asked about it, his only response was, "This is why we have lawyers", and then he continued to deny the relevance of the law to the open governance bodies at LSUS.

### III.   DR. SALVATORE'S REQUEST FOR ALL SUPPORTING DOCUMENTATION

Dr. Salvatore respectfully requests a full and complete copy of all documents which LSUS contends are supportive of the allegations. Pursuant to *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the tenured public employee is entitled to examine all evidence that the employer utilizes in making it's determination.

### IV.   DR. SALVATORE'S REQUEST FOR A DUE PROCESS PROCEEDING

Dr. Salvatore respectfully requests that a committee be appointed to conduct full due process hearing.

Please address all correspondence and communications relating to this matter to the undersigned.

With kindest regards, I am

Sincerely yours,

J. Arthur Smith, III

JASIII/ rb
cc: Dr. Brian Salvatore