**DR. BRIAN SALVATORE**

**V.**

**LOUISIANA STATE UNIVERSITY SHREVEPORT**

---

### AFFIDAVIT OF DR. BRIAN SALVATORE

---

**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

 **BEFORE ME**, the undersigned notary public, personally came and appeared, **DR. BRIAN SALVATORE**, who, after being duly sworn, did take oath, depose and state as follows:

### BACKGROUND

 I began teaching at LSUS in August 2003, as an Associate Professor. I was awarded tenure in 2007 and was promoted to Full Professor in 2012. From 2016 through 2022, I served as the Chair of the Department of Chemistry and Physics. I found the Chair position to be stressful, and ultimately stepped down in August 2022. Under my leadership, the chemistry program enjoyed significant recognition and success. The department also launched an active student recruiting effort and enhanced its efforts towards project-based learning in applied physics. Until 2019, I had no negative evaluations or write-ups.

 In 2014-2015, I participated in a matter regarding the emergency removal of over 16 million of pounds of hazardous chemicals from Camp Minden, a Louisiana National Guard site located east of Shreveport. I spoke out publicly against the government's plan to open burn hazardous chemicals at Camp Minden. A citizens group worked to stop the open chemical burn at Camp Minden. I played a significant role in this effort, drawing upon my scientific training and knowledge to help identify safer alternatives to remove the chemicals. This civic action forced the EPA to cancel its plan to open burn the chemicals, and it resulted in the design and construction of a state-of-the-art clean burn system to remove the chemicals. This was a significant achievement that prevented severe environmental impact on the area. The state awarded the contract to remove the materials to ESI, a company owned by the Poe family. However, when the removal was nearing completion, the Poe family claimed ownership of the clean burn system and announced their plans to form a joint venture with the Minden-based Madden family. This plan would have not only permanently kept the burn system at or near Camp Minden but would have also trucked in millions of pounds of additional hazardous chemicals from all over the country each year. I spoke out against this idea, citing the original purpose of the burn system, which was strictly to remove the existing hazardous materials from Camp Minden. Representative Gene Reynolds and Governor John Bel Edwards agreed with me and other members of the community who opposed the

1



Poe/Madden plan. The Governor informed the Poes and Maddens that the burn system belonged to the state, not to them, and it would be sold and moved out of northwest Louisiana.

In February 2017, Chancellor Larry Clark informed me that a member of the Madden family had written to LSU President F. King Alexander to complain about my comments against keeping the burn chamber at Camp Minden. Thereafter, I observed that Chancellor Clark's behavior towards me changed. I observed an effort by the Chancellor to deny me any awards, recognition, or promotions. I also noticed that the LSUS administration began documenting matters professionally detrimental to both myself and my spouse, an LSUS biology professor, from that point onwards.

In June 2017, Gov. John Bel Edwards appointed me to the Louisiana Environmental Education Commission, and he was confirmed by the state Senate. I served as an Advocacy Commissioner from 2017-2022, with the responsibility to inform and advocate for Louisiana residents on environmental matters.

In spring 2017, my immediate supervisor, Associate Dean Dr. Steven Banks, asked me to apply for the position of Dean of the College of Arts and Science. I applied, but was not granted an on-campus interview (first in 2017 and then again in when the search was reinitiated in 2018). Two members of the search committee told me that Chancellor Clark had intervened in the search process and instructed the Chair of the Search Committee (Dr. Dennis Wissing) not to grant me an interview. Dr. Banks also withdrew his support of my application after a conversation with a member of the administration.

In December 2021, Dr. Peter Siska and I were invited to make a joint presentation to the Caddo Parish Commission about the potential dangers of hydraulic fracturing (fracking) to drill for natural gas within a region of Shreveport near Cross Lake, the local municipal water supply. I gave a comprehensive presentation about the nature of the hazardous chemicals used as surfactants in fracking and explained why the Commission should not allow these chemicals to be used near Cross Lake. I also cited fracking mishaps that had occurred within the ArkLaTex, despite the best of intentions on the part of the oil and gas industry. The following Saturday at graduation, Chancellor Clark came up to me and said that he had "been told to go after you" for making that presentation, presumably by a member of the oil and gas industry who was not happy with the information that I provided to the Commission. When I suggested that he knew who this individual may be and mentioned his name, Dr. Clark developed an angry expression on his face, wheeled around and walked away without saying anything further. After that, Dr. Clark and the Provost Helen Taylor doubled down in their efforts to further harm me professionally.

Since that time, I have continued to express myself as a member of the LSUS community. I firmly believe that my proposed termination is motivated as a response to the exercise of my rights under the First Amendment to the United States Constitution.

## LSUS CHARGES AGAINST ME

**ALLEGATION NO. 1 – I voiced concerns regarding the amount of chemical waste attributed to the Science Department.**

The allegations which I made in the Spring of 2021 were accurate and were not made with any malice or any intention to harm LSUS or its staff, but rather to protect the university. I was told that during the pandemic in summer 2020 that the Facility Services Department did not properly operate the climate control system in the Science Building, resulting in condensation on the ventilation ducts that caused mold to grow and spread throughout the building. The Facilities Services crews then improperly removed and disposed of moldy materials, which caused the mold to spread further. Some faculty and staff who had returned to the building reported skin and respiratory problems, likely caused by exposure to the mold. Other science faculty and I petitioned Chancellor Clark to take appropriate action to address the mold problem. I also sent samples of the moldy particulates to a mold remediation company for independent analysis. That mold analysis indicated that some of the mold was potentially harmful to people in the building. LSUS then hired an independent consultant who inspected the Science Building, including the ventilation system. The consultant's report noted significant mold and fungal growth in the building and recommended that the Science Building be closed for remediation, beginning in January 2021. It remained closed until August 2021. During the closure period, Chancellor Clark often characterized the mold in the Science Building as a "chemical particulate" problem. I disagreed and spoke out to defend the Chemistry Department from inaccurate overstatements regarding the amount of chemical waste.

I declined to fully accept the conclusions of the investigation by the LSU Office of Internal Audit because I did not believe that this Office had adequate technical information to arrive at a correct analysis of issues regarding chemical wastes

**ALLEGATION NO. 2 – I stated that I thought that the administration initiated the removal of electronic documents.**

I had a reasonable belief that the LSU administration was connected to the removal of certain documents from my personal electronic storage. In March 2019, Dr. Banks and I discovered the body of LSUS Computer Science Department Chair Dr. Michael Doran, who had died of an apparent heart attack in his own home. I immediately informed the Chancellor. I took two photographs of my deceased colleague. Chancellor Clark came to the Doran home and sat with the body for several hours until Dr. Doran's wife returned from New Orleans. I showed the photographs of how Dr. Doran died to my colleague who had preceded me as department chair, and they discussed the inordinate amount of stress that department chairs are placed under. I believe that this information was passed on to the administration by that colleague. I had a good faith reasonable belief that the administration had initiated the removal of these photos from both my personal cell phone and personal iCloud account, along with other personal computer documents. I know of no other person or entity who would have any reason and/or access to remove this electronic information. In April 2021, LSUS Police Chief Donald Wray conducted an investigation, taking my phone to the Bossier City Police Department for a forensic examination. The Bossier Police Department had the phone for about three days but found nothing conclusive.

3

Chief Wray noted that another method of searching for tampering would have involved destroying the phone. I consented to destruction of my cell phone, but the investigation was discontinued.

## ALLEGATION NO. 3 – I alleged sex discrimination against my wife by Dr. Clark.

I had a good faith reasonable belief that the then-Chancellor Larry Clark had paid undue attention to my wife, Dr. Elahe Mahdavian, based on my wife's representations to me and the fact that she filed, under oath, a sexual harassment charge with the United States Equal Employment Opportunity Commission. For a period of several years, Dr. Mahdavian and I witnessed and experienced questionable conduct by Chancellor Clark, who followed Dr. Mahdavian alone into parking lots and behaved inappropriately toward her. Dr. Mahdavian filed the EEOC charge against Dr. Clark in July 2021 and received a letter from the EEOC informing her of her right to sue. Chancellor Clark then began to seek to discredit my wife's charges against him but I always believed and supported my wife of twenty-five (25) years.

## ALLEGATION NO. 4 - I stated that stress in the workplace contributed to a workplace injury.

I had a good faith, reasonable belief that workplace stress contributed to an injury sustained by my administrative assistant, Kathi Garcie. She suffered an injury to her hand requiring stitches. I believe that Ms. Garcie suffered this injury as a result of working under stressful working conditions caused by Associate Vice Chancellor, William Wolfe. I was informed that Ms. Garcie was working to complete the Department's inventory under a rush deadline from Wolfe. Ms. Garcie and other staff said that Wolfe pressured employees who turned in their inventories late. Ms. Garcie was trying to do a complete and thorough job, and in her hurry, she accidentally cut her finger. I took Ms. Garcie to an urgent care clinic where she received stitches. During that visit, Ms. Garcie described the pressure she was under from Wolfe.

## ALLEGATION NO. 5 – I expressed my opinion that Dr. Lin performed an assignment incompetently.

According to LSU PM-69, the President of the University may delegate the selection of sabbatical recipients to the Chancellors of the individual campuses. LSU PM-69 prohibits this delegation. The LSUS met in a closed meeting and used new criteria to evaluate the proposals. Those new criteria had never been approved by the full Faculty Senate.

Several science faculty members were upset about the grant and sabbatical application evaluation process overseen by Dr. Lin's Committee. Some of these individuals asked me, as their Faculty Senate representative, to see that the FRDGC accounted for its decisions in reviewing the proposals. Dr. Lin was invited to explain and justify the Committee's actions during the October 2022 Faculty Senate meeting. I expressed the opinion that Dr. Lin performed his assignments unsatisfactorily. I asked Dr. Lin to inform me how faculty could appeal the award decisions. Dr. Lin deferred to Faculty Senate Present Allen Garcie who declined to answer. I inquired again, but still no answers to my concerns were forthcoming. I then followed up with an email stating that I believed the entire evaluation process had become "corrupt" and "incompetent", and I called on Dr. Binshan Lin to step down as Committee Chair, which he ultimately did. I also asked if Chancellor Clark had contacted any members of the Committee during the review process and

interfered with the fair evaluation of the proposal applications. One member of the committee did not respond. Both Dr. Beverly Burden, the science faculty representative on the committee and Provost Taylor also declined to provide an answer to this question. I fully believed that his characterizations were true and accurate and my statements were intended to strengthen the university's practices.

**ALLEGATON NO. 6 – I expressed my feelings and frustrations to my students.**

I acknowledge that I made these comments to my students about my then planned departure from the university. I experienced these feelings as a result of actions and inactions I believed had been taken by the members of the University administration. I stated to my class that I knew of two professors who had contemplated suicide due to ill treatment by Chancellor Larry Clark. I was then asked to meet with my department chair and dean. At this meeting, I identified the two faculty members who had confided in me about their suicidal thoughts that they stated were brought on by the actions of Chancellor Clark. I said that while there may not have been professors actively having suicidal ideation at the time of his comment, but that generally, over the past year, multiple professors had complained to me of psychological abuse, harassment, cruelty, retaliation and discrimination because their work environments at LSU-S. I had a reasonable, good faith, belief that actions of LSUS administration had resulted in unhealthy conditions for LSUS staff detrimental to the university.

**ALLEGATION NO. 7 – I reported what I believed was plagiarism.**

While working in my lab, I often listened to LSUS history professor Dr. Alex Mikaberidze's weekly radio show, "Treasures of the Noel," on NPR affiliate Red River Radio. Red River Radio is based on the LSUS campus.

I initially recognized some serious factual errors in the content of some of the episodes of the radio show. I investigated the sources of the errors, and concluded that they had originated from sources that Dr. Mikaberidze had plagiarized. It was and is my belief and opinion that Dr. Mikaberidze committed plagiarism in several episodes of his radio show. This included plagiarizing an Amazon.com, Fortune Magazine, two UK authors who created a series the Great Courses, and book review book collector in Oregon. I provided Kermit Poling, the General Manager of Red River Radio, with an audio transcript of Dr. Mikaberidze's radio episode about a book by Mary Pickford that I believe was plagiarized from Amazon.com's website.

I shared my findings with the LSUS Policy and Personnel Committee; the Chair of the History Department (Dr. Mikaberidze's supervisor); Dr. Mikeraberidze's assistant (Dr. Laura McClemore, and Mr. Poling. Mr. Poling brought this concern to his direct supervisor, Chancellor Larry Clark, and to Provost Helen Taylor. However, they did not address my concerns. Mr. Poling, himself, performed a cursory investigation into the allegations of plagiarism. He then canceled "Treasures of the Noel" and deleted all of the series' episodes from the station's archives.

My motivation to alert the publisher had nothing to do with Dr. Mikaberidze's service on a grievance committee. I believed that I had an ethical duty to report what I believed was plagiarism. I had a good faith, reasonable belief that plagiarism had been committed and his actions

were not to harm LSUS but to protect the university. I harbor no animosity against Dr. Mikaberidze and I am advised that I hold a legal privilege under Louisiana law to voice my concerns about what I believed to be plagiarism.

**ALLEGATION NO. 8 – I expressed my concerns about hazardous environmental waste issues.**

In January 2020, I learned that the University was planning to send hazardous chemicals to Clean Harbors for disposal. I emailed Facilities Services Director Art Shilling, to inform him that Clean Harbors Colfax had had numerous environmental violations in the past and that I felt that LSUS should not engage with the company. Clean Harbors Colfax had numerous air, water, soil, and safety violations, and hundreds of complaints from residents of Grant Parish according to the Louisiana Department of Environmental Quality. The company's permit to continue open burning hazardous chemicals has since been denied. I asked Mr. Shilling to assure me that no LSUS chemicals would go to Clean Harbors Colfax, but Mr. Shilling could not do that. Furthermore, no LSUS administrators copied on Mr. Shilling's email ever responded to me about my concerns.

In 2015, a quantity of hazardous chemicals was secretly sent to Clean Harbors Colfax to be open burned, adjacent to a community called The Rock, whose residents are largely African American. The concerned citizens group and others throughout central Louisiana were outraged. I believed that there were safer alternatives for destroying the chemicals, but the company had failed to consider any of them. Myself and others lobbied state and federal government officials, asking that Clean Harbors be required to install a safe contained burn system in Colfax, but this was not done. I attended many meetings about this situation and testified with General Russel Honoré at two Louisiana legislative committee hearing in an attempt to introduce legislation to stop open burning in Colfax.

I sent emails and had conversations with the LSUS administration regarding my concerns. However, I did not receive a response. Based on my good faith, reasonable belief that LSUS hazardous materials were being sent to Colfax, I posted my concerns regarding this community safety issue to social media. It was only after my social media post, in March 2023, that I received a response to my concerns from the University. Blake Rodgers, LSUS Director of Environmental Health & Safety, emailed me, and claimed that none of the chemicals from LSUS had been burned in Colfax, although he furnished no evidence to support his statement. As soon as I received response from Mr. Rodgers, dated April 4, 2023, I immediately removed his post from social media.

The other item of contention was a comment on another post, which I did not remove, indicating that LSUS was sending chemicals to Clean Harbors, the same company that burned hazardous materials in Colfax. I personally observed the University sending chemicals to Clean Harbors and I am in possession of the manifest of these shipments of hazardous chemicals. I believed this to be true, and no issue was ever raised as to its accuracy. I never posted anything to social media, nor maintained any information that I was told was not true.

**ALLEGATION NO. 9 – I expressed my opinions about Dr. Clark's actions.**

My prepared public comments before the Shreveport Mayor's Capital Improvement Committee, delivered on September 7, 2023 will be presneted to the committee. I stated at the beginning of my comments that I was speaking as a citizen and not as an employee or representative of the University.

I have had significant personal and professional differences with former Chancellor Larry Clark.

I believe that Chancellor Clark appointed people to positions for which they had no experience or ability, such as a Provost who had never served as a department chair or dean, as well as a Chief Financial Officer and a Facilities Director, neither of whom had any prior university experience. Dr. Clark appointed the Provost without having conducted a search. He also appointed a faculty member to head the Noel Rare Book Collection who had no experience whatsoever with rare books.

I believe that Chancellor Clark has violated LSU policies on numerous occasions, and he participated in violations of the state Open Meetings Law.

I questioned why Dr. Clark was appointed chair of the Mayor's Capital Improvement Committee without the consent of the other committee members, and I believe that the Mayor of Shreveport made a mistake with this appointment. I have encouraged citizens to seek out the underlying reasons why the Mayor wants the City to take on a large additional debt, and sell municipal bonds in a high interest rate environment, when other alternatives existed to increase the city's operating cash reserves.

**ALLEGATION NO. 10 – I voiced concern about violations of the Open Meetings Law.**

On September 7, 2023, I received an email from Staff Senate President Matthew Culpepper, indicating that campus members could submit meeting agenda items to a staff senator or through an anonymous agenda submission form. I called Mr. Culpepper to inform him about the wording in the *Staff Senate Constitution and Bylaws*, requiring that the Staff Senate Executive Committee approve the agenda for each Staff Senate meeting. Mr. Culpepper replied that they did not need to meet openly, but that they have held some "social gatherings,". However, he did not explain why the agenda item submission was anonymous. He said he "didn't need to get into this" with me and hung up. Mr. Culpepper claimed he was acting in accordance with what LSU's counsel had advised. Later that day, my understanding of the Open Meetings Law and the ways in which I believed that Mr. Culpepper was violating this law. I also stated that he would take the Open Meetings Law issue to the Attorney General's office.

In October 2023, Bill Wolfe, head of LSUS HR, and Jennifer Isaac conducted an investigation on behalf of Mr. Culpepper and Cassandra Williams, the President of the Faculty Senate, who had accused me of harassing and threatening them. In an interview with Mr. Wolfe and Ms. Isaac, Mr. Culpepper claimed that during the September 7th phone call, I became

increasingly accusatory and hostile, so Culpepper hung up. Mr. Culpepper apparently interpreted my remark about going to the Attorney General as a threat. According to Mr. Culpepper, I emailed again on October 2, 2023, alleging impropriety by Mr. Culpepper and other administrators. Mr. Culpepper apparently interpreted my tone as threatening and claimed that it made him consider resigning from LSUS. However, my statement about reporting to the Attorney General's office was simply a statement of fact as to what I, as a citizen of the State of Louisiana, had a legal right to do, particularly since I had a good faith reasonable belief that the Faculty Senate and Staff Senate Executive Committees had violated the Open Meetings Law. My statements were not made with malice to harm LSUS but to protect the university and to follow the law.

**ALLEGATION NO. 11 – I stated that Dr. Williams may be in violation laws and policies.**

I never bullied Dr. Cassandra Williams. I merely informed her that she was not following the *Faculty Senate Bylaws*, which mandate that the Faculty Senate Executive Committee must meet to prioritize agenda items for full Senate meetings. I had been informed about one secret meeting of the Faculty Senate Executive Committee by my Department's Administrative Assistant, Kathi Garcie, who is the spouse of past Faculty Senate President Allen Garcie. Ms. Garcie told me that both Provost Helen Taylor and Chancellor Clark had attended a Faculty Senate Executive Committee meeting in fall 2021, and made derogatory comments about me to the committee. They discouraged the members of the committee from allowing the full Faculty Senate to discuss the very serious mold problems in the Science Building. I believed that this Executive Committee meeting was held in closed door session with the administration. My comments were factual and not intended to be nor were they threats.

**ALLEGATION NO. 12 – I stated that I thought that the LSUS administration had deleted my computer files.**

On Sunday, October 29, 2023, I was at my home, recording online lessons, when someone apparently deleted over 20,000 personal computer files, from both the university-owned laptop I was using and also from my home network-based hard-drive backup system. This person entered my home network and personal computer file backup system through the university laptop, deleting files that did not belong to the university, but rather were my own intellectual property. This included every file in my "LSUS Teaching" folder, which included every lecture I had given at LSUS for the past 21 years. Also deleted were my research proposals, manuscripts, and personal files including my state and federal tax returns and medical records. On October 30th, I reported this event to the LSUS Campus Police, but they were of no help.

In light of my prior experience with former Campus Police Chief Donald Wray relative to the first deletion of my electronic images from my phone and iCloud backup, I declined to allow the campus police to take this laptop and hard drive for a forensic analysis, as I preferred to have such an examination conducted by an independent forensic expert.

I had a good faith, reasonable belief that someone within the LSUS administration had improperly deleted my files, and, as a result of his belief, I reported this to the proper authorities.

8

**ALLEGATION NO. 13 – Three Department Chair wrote a letter after a Faculty Senate meeting.**

I stated that if Chancellor Robert Smith truly believed in the critical role of shared governance at LSUS, he would not have disregarded the state Open Meetings Law and allowed the Faculty Senate, Staff Senate, and Provost's Council to disregard their responsibilities to adhere to the precepts of this law.   When shown the open meetings law and asked for his opinion, Chancellor Smith responded "This is why we have lawyers."

I was elected to the Faculty Senate and believed that I had a duty to speak out in this public forum about which I felt was wrong. The Faculty Senate should be strong enough to entertain robust comments from the elected representation.

DR. BRIAN SALVATORE

Sworn to and subscribed before me this ____ day of April, 2024.

J. Arthur Smith, III
Notary Public
La. Bar Roll No. 07730
My commission expires at death

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has this date been served upon all counsel of record via U.S. Mail, postage prepaid and properly addressed, via facsimile and/or E-Mail as follows to:

> Carlton (Trey) Jones
> Deputy General Counsel
> Louisiana State University
> 3810 West Lakeshore Dr., Suite 124
> Baton Rouge, LA 70808
> Email: jones@lsu.edu

Baton Rouge, Louisiana, this _____ day of April, 2024.

_____
J. Arthur Smith, III